J-S04025-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KIMBERLY ANN ROACH-TROCHAK | : | |
| | : | |
| Appellant | : | No. 1092 EDA 2025 |

Appeal from the Judgment of Sentence Entered March 3, 2025
In the Court of Common Pleas of Bucks County
Criminal Division at No: CP-09-CR-0001936-2023

BEFORE: LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY STABILE, J.:                    **FILED JUNE 5, 2026**

Appellant, Kimberly Ann Roach-Trochak, appeals from her judgment of sentence of four to ten years' imprisonment for homicide by vehicle and related offenses. Appellant argues that the trial court erred by denying her motion to suppress the results of a blood test taken after a single-vehicle accident in which she drove her car into a tree, killing one of the passengers. We affirm.

The trial court accurately recounted the evidence adduced during Appellant's non-jury trial as follows:

> On August 26, 2022, at approximately 2:18 a.m., Officer Andrew Brown ("Officer Brown") of the Upper Southampton Police Department was the first officer to respond to the scene of a single-vehicle accident at 1293 Churchville Road, Upper Southampton Township, Bucks County, Pennsylvania. On August 25, 2022, Brooke McTamney ("Brooke") and her mother, Marita McTamney ("Marita"), planned to spend time together having dinner and drinks. Marita also invited her friend, [Appellant], to join them. The trio began their evening at approximately 6:33

p.m. at the Ashburner Inn in Philadelphia, Pennsylvania. [Appellant] drove everyone there in her 2012 Silver Nissan Rogue (the "Vehicle"). While there, all three women consumed alcoholic beverages, including shots.

At approximately 9:40 p.m. that evening, the trio proceeded to the Bryn Athyn Civic and Social Club (the "Social Club") in Montgomery County, Pennsylvania. Because Brooke believed she was the least intoxicated, she drove the vehicle to the Social Club. They arrived at approximately 10:29 p.m. Before entering, [Appellant] and Brooke sat in the parking lot and smoked "a bowl" of marijuana; Marita did not participate.

Once inside the establishment, all three sat at the bar. Marita and [Appellant] continued to consume alcoholic beverages, while Brooke testified that she stopped drinking. At approximately 11:21 p.m., Brooke exited the Social Club and returned to the vehicle, got into the front passenger seat, fully reclined the chair and fell asleep.

Meanwhile, [Appellant] and Marita remained inside. At approximately 11:41 p.m., [Appellant] stepped outside, leaving Marita alone at the bar. Shortly thereafter, at approximately 12:07 a.m., Marita also left the bar, but both women re-entered the bar by 12:16 a.m. At some point, the bartender "flagged" [Appellant] for signs of visible intoxication and stopped serving her alcohol.

At approximately 1:25 a.m., Marita vomited on the floor of the Social Club. The Manager of the Social Club requested both women to clean up the mess; they refused and were asked to leave the premises at approximately 1:34 a.m. Marita exited the Social Club first and assisted [Appellant] down the stairs due to her impaired state.

The Bryn Athyn Civic and Social Club is a membership-only bar in which [Appellant] was an applicant and probationary member. Brooke, who remained asleep in the vehicle, was woken up by [Appellant] and Marita returning to the vehicle. Marita asked Brooke to drive them back to her house in Churchville, Bucks County, but having just woken up, Brooke said she was not going to drive. [Appellant] then assumed control of the vehicle — she positioned herself in the driver's seat, Brooke remained fully

- 2 -

reclined in the front passenger seat, and Marita seated herself in the rear driver's side.

While driving southbound on Churchville Road, Brooke, in a semi-conscious state, overheard Marita repeatedly screaming [Appellant]'s name — "Kim!" Brooke opened her eyes and observed [Appellant] unresponsive at the wheel, her head tilted to the side and eyes closed. Approaching a sweeping left-hand bend in the road, [Appellant] failed to maintain control, and the vehicle veered off the roadway, striking a tree head-on. Only [Appellant] was wearing a seatbelt and no airbags in the rear of the vehicle deployed.

Officer Brown arrived at the scene to find the vehicle pressed against the tree. Brooke was outside the vehicle on the passenger side curled over and yelling in pain. [Appellant] was pinned between the driver's seat and the steering wheel, drifting in and out of consciousness. Marita was found slumped forward, face down, between the two front seats over the center console. Officers removed Marita, who was without a pulse, and began CPR. Officer Brown applied a defibrillator to Marita, but there was no shock and the defibrillator was unable to reset her pulse. Brooke and Marita were transported to St. Mary's Hospital ("St. Mary's"); [Appellant] was taken to Abington Hospital ("Abington"). Marita showed no signs of life during transport, and she was pronounced dead at St. Mary's. Brooke was considered to be in serious but stable condition and required emergency surgery.

On August 26, 2022, Lieutenant Anthony Marsaglia ("Lieutenant Marsaglia") of the Upper Southampton Police Department obtained and executed a search warrant on the vehicle. Found within the Vehicle was "a couple bags of marijuana, some were in leaf form, some were in bud form; a grinder; [and] two bags of edibles ...."

On August 29, 2022, at the request of Officer Ethan Dilcherd of the Upper Southampton Township Police Department, [Appellant] consented to a blood draw. Although [Appellant] consented to a blood draw, Officer Brown and Lieutenant Marsaglia also obtained a search warrant and took possession of [Appellant]'s blood vials drawn at Abington from the time she received treatment. The blood vials were transported to NMS Labs ("NMS") in Montgomery County, Pennsylvania, for testing. NMS produced a report

showing [Appellant] to have ethanol, Delta-9 THC, and Delta-9 THC metabolite in her system. The results indicate that [Appellant] had a BAC of .065 (ethanol), a 81 +/- 25 nanograms per milliliter (Delta-9 Carboxy THC), and a 13 +/- 4 nanograms per milliliter (Delta-9 THC).

Trial Court Opinion, 5/28/25, at 1-4.

Appellant was charged with homicide by vehicle while driving under the influence (75 Pa.C.S.A. § 3735(a)(1)(i)), aggravated assault by vehicle while driving under the influence (75 Pa.C.S.A. § 3735.1(a)), multiple counts of driving under the influence and several traffic offenses.

Appellant filed a motion to suppress the results of the blood test from the blood drawn at Abington Hospital following the incident. Following a hearing, the court denied the motion to suppress. The case proceeded to a non-jury trial in which the court found Appellant guilty of all charges. On March 3, 2025, the court entered sentence. Appellant filed timely post-sentence motions, which the court denied, and a timely appeal. Both Appellant and the court complied with Pa.R.A.P. 1925.

Appellant raises two issues in this appeal:

Did the trial court err in denying Appellant's Omnibus Pre-Trial Motion To Suppress the results of Appellant's blood test where Appellant did not knowingly, voluntarily, and intentionally submit to the testing?

Did the trial court err in denying Appellant's Omnibus Pre-Trial Motion To Suppress the results of Appellant's blood test where the search warrant was not supported by probable cause?

Appellant's Brief at 8.

Both of Appellant's arguments challenge the denial of her suppression motion. In such cases,

> our standard of review "is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010). While we defer to the court's factual determinations when supported by the record, "we are not bound by the suppression court's legal rulings, which we review de novo." *Commonwealth v. Briggs*, 12 A.3d 291, 320-21 (Pa. 2011).
>
> Our scope of review is limited to "the evidence presented at the suppression hearing." *Commonwealth v. Harlan*, 208 A.3d 497, 499 (Pa. Super. 2019). We "consider only the Commonwealth's evidence and so much of the defense's evidence as remains uncontradicted when read in the context of the suppression hearing record as a whole." *Commonwealth v. Turpin*, 216 A.3d 1055, 1060 (Pa. 2019).

*Commonwealth v. Troutman*, 349 A.3d 1008, 1012 (Pa. Super. 2025).

The first issue, which we find dispositive, is whether Appellant gave valid consent to a blood draw. We hold that she did.

Preliminarily, we observe that Officer Dilcherd, the officer who met with Appellant at the hospital, did not provide a DL-26 form[1] to Appellant or read her the warnings listed on this form. It was not necessary for Officer Dilcherd to take this step, because Appellant was not under arrest, and there was no probable cause to arrest her for driving under the influence. ***See***

---

[1] The DL-26 form provides those arrested or suspected of DUI with their rights pursuant to 75 Pa.C.S.A. § 1547.

*Commonwealth v. Montillja*, 2025 WL 2400034, *4 (Pa. Super., Aug. 19,

2025) (unpublished memorandum).[2]

> Turning to the issue of consent,
>
> [t]he Fourth Amendment to the Constitution of the United States and Article I, § 8 of the Constitution of the Commonwealth of Pennsylvania both prohibit unreasonable searches and seizures. The administration of a blood test, performed by an agent of, or at the direction of the government, constitutes a search under both the United States and Pennsylvania Constitutions. If an officer performs a blood-draw search without a warrant, it is unreasonable and therefore constitutionally impermissible, unless an established exception applies. Exceptions to the warrant requirement include the consent exception. For the consent exception to apply, the consent must be voluntary.

*Commonwealth v. Johnson*, 188 A.3d 486, 489 (Pa. Super. 2018).

Our Supreme Court has provided guidance on determining whether the

defendant has provided consent voluntarily and intelligently:

> While there is no hard and fast list of factors evincing voluntariness, some considerations include: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with law enforcement personnel.

*Montillja*, 2025 WL at 2400034, *2 (citing *Commonwealth v. Gillespie*,

821 A.2d 1221, 1225 (Pa. 2003)).

_____

[2] *See* Pa.R.A.P. 126(b) (non-precedential memorandum of this Court filed after May 1, 2019 may be cited for its persuasive value).

Here, the trial court made a factual finding that Appellant gave consent to the blood draw in the emergency room. The court opined:

> [I]n examining the circumstances objectively, we note that [Appellant] was receiving treatment and had substantial injuries; however, she was not placed into police custody or forced to give consent. Officer Dilcherd was at Abington [Hospital], and based on the investigation and evidence gathered, he asked for consent and [Appellant] agreed. [Appellant] was awake and conscious and had just returned from receiving a CT scan. As such, in consideration of the totality of the circumstance, we believe [Appellant] knowingly, voluntarily, and intelligently gave consent.

Trial Court Opinion, 5/28/25, at 12-13.

The record supports the court's finding of consent. During the suppression hearing, Officer Dilcherd testified that he was present in uniform in the hospital emergency room following the accident. N.T., 12/12/24, at 10. The record does not indicate that any other police officer was in the room. Medical personnel were in the room, so Officer Dilcherd was not alone with Appellant. *Id.* There was no evidence that Officer Dilcherd had physical contact with Appellant, directed her movements, or exhibited any coercive behavior.

Officer Dilcherd testified, "[Appellant] was taken for a CT scan. Upon returning back I asked her to consent to a blood draw due to the nature of the crash that she was just involved in, and she responded that she would consent to a blood draw." *Id.* at 12. He continued:

> Q. When you would ask [Appellant] for consent was she under arrest?
>
> A. No.

Q. Was she placed into handcuffs?

A. No.

Q. Was she ever advised that she wasn't free to leave?

A. No.

Q. Or was she ever advised that she had to give that consent for blood?

A. No.

*Id.* at 13.

Furthermore, while counsel for Appellant suggested during Officer Dilcherd's cross-examination that Appellant had suffered a stroke during the accident, counsel did not present any medical evidence to support this suggestion. Nor did counsel present any medical evidence during the suppression hearing that indicated Appellant could not understand Officer Dilcherd or consent voluntarily and intelligently to a blood draw.

This evidence supports the court's determination that Appellant gave valid consent to the blood draw. *Montillja*, *Gillespie*, *supra*. Therefore, the trial court properly denied her motion to suppress.

Because we have determined that Appellant gave valid consent to a blood draw, we need not address her second issue concerning the validity of the search warrant for her blood draw.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/5/2026